## BREDIN v. BREDIN.

To make the declarations of the obligor in a bond evidence to affect its validity, against the obligee, they must be accompanied with proof of such confederacy between the parties, as would, in other cases, make the acts of one the acts of the other.

When a conspiracy, between the obligor and a third person to defraud the creditors of the obligor, has been satisfactorily proved, it may be shown, that the obligee engaged in it subsequently, by less than proof of express declarations, or flagrant acts of participation.

When it appeared, by the proof of a conspiracy between the obligor and such third person, that the obligee was to be a principal actor in the execution of the plot, and he performs the part assigned ) him in it, by arriving at the house of the obligor, who was his brother, making a for nal settlement with him, and receiving the bond, which is entered up just on the nick of time to take precedence of the other creditors, who were then preparing to pounce upon the property of the obligor, it was held, that these facts, combined with the consanguinity of the parties and the desperate circumstances of the obligor, were proper to be left to the jury, as circumstantial evidence of collusion.

In such a case, the intrinsic evidence of the whole transaction may properly be left to

the jury, to connect the obligee with the original scheme; and such evidence, in connection with the acts of the obligee, is sufficient to shift the burden of exculpatory proof upon the latter.

Where a daughter of the obligor, who proved the execution of the bond after a settlement at which papers were used and calculations made, farther testified, that her father said, he had borrowed $800 from her uncle, and that the latter afterwards said, he had lent her father an additional hundred, and where none of the papers or calculations were produced at the trial, nor any attempt made to account for the residue of the consideration, amounting to $5000, such evidence, although by no means entirely demonstrative of fraud, was proper to be left to the jury.

In such a case, testimony to prove the circumstances of the obligor was competent.

ERROR to the Common Pleas of Perry county.

*June* 1. It appeared, that James Bredin, the defendant in error, who resided in Cumberland county, owned lands in that county, and also in Perry; and that John Bredin, the plaintiff in error, entered a judgment, in the court of Common Pleas of Perry county, on the 21st of May, 1834, against him, by virtue of a warrant of attorney on his judgment-bond executed on the 4th of November, 1833, and given to the said plaintiff, in the penalty of $12,000, conditioned for the payment of $5980, with interest. On this judgment, a *sci. fa.* was issued, to August Term, 1836, which was returned *"nihil,"* by the sheriff; when an *alias sci. fa.* issued, to November Term, 1836, to which the defendant appeared and confessed judgment. The defendant's death was subsequently suggested, and a *sci. fa.* issued on the judgment as revived, against Ann Bredin, his administratrix, with notice to terre-tenants, on which, judgment of revival was entered, on the 2d of April, 1840. On this judgment, a *sci. fa.* issued to November Term, 1842, when an appearance was entered for John Agnew, a creditor, who had obtained a judgment, on the 30th of November, 1841, in the Court of Common Pleas, of Cumberland county, against James Bredin's administratrix, for $2947 65. Previously to this, the property, real and personal, of James Bredin, the defendant, in Cumberland county, where he resided and died, had been sold by the sheriff, and the money raised by the sale thereof appropriated to judgments and executions against him, except about $26, which was paid to his administratrix, on the 2d of October, 1839, by the sheriff.

The defendant's estate, in Cumberland county, having been thus exhausted, the Court of Common Pleas of Perry county, upon the application of the creditors of James Bredin, the defendant, permitted this judgment to be opened, for the purpose of trying whether the judgment-bond was not given by collusion and contrivance between the plaintiff and defendant, to defraud the creditors. The cause went to trial upon the plea of payment. &c.

The· plaintiff read in evidence the bond and judgment, and the revivals thereof, by writs of *sci. fa.*, against the defendant and his administratrix.

The defendants, after giving in evidence the judgments obtained by John Agnew against the defendant's administratrix, and the different appropriations made by the Court of Common Pleas of Cumberland· county, of the proceeds of the sales of the real and personal estate of the defendant, in said county, and so of the payment of $26, the balance unappropriated, by the sheriff to the administratrix of the defendant, proved that the·farm of the defendant, in Perry county, which this judgment was designed to cover, contained nearly two hundred acres, and was worth about $2500, and that since the death of defendant, his widow had received the rents thereof.

The defendant then offered to ·prove by John Gray, that about the time James Bredin's property was sold, in Cumberland county, by the sheriff, that he, the witness, heard that his creditors were likely to procure judgments against his Perry county property, and that he went and told James Bredin, who then said that he would execute a'judgment to his brother John Bredin, to whom he was not indebted, so as to cover that property; that the witness furnished the said James Bredin, at his request, with the form of a judgment-bond.for that purpose, and that immediately after this, the bond now in suit was executed and filed of record in this county, to wit: in May, 1834.

The plaintiff's counsel objected to the above offer, for the following reasons:

That John Bredin, plaintiff, was not present, and knew nothing of the alleged declaration of James Bredin, that he would execute a judgment to his brother John, or that he was not indebted to him, so as to cover the property, &c.

That the plaintiff's rights cannot be injuriously affected by the acts or declarations of defendant ·in his absence, and without his knowledge.

That the offer does not import that John Gray was present, and saw the bond executed.

Objection overruled, which was plaintiff's first bill of exception. The witness then testified to the facts stated in the offer, and that the plaintiff, John Bredin, was down shortly after that, in Carlisle, at his brother's.  He saw him there, and spoke to him.

The defendants then offered to prove, by William Line, that the defendant was in affluent circumstances, until about the time he

was sold out by the sheriff, and that he had large sums of money in his possession. This was objected to by the plaintiff, on the ground of irrelevancy. The court overruled the objection, which was plaintiff's *second* bill of exception. The witness then testified, in substance, as follows :—

"I knew James Bredin, intimately ; he was considered one of the wealthiest men in our county, until about 1830. He owned many farms, some of the most valuable ones in the county. I saw at one time in his possession—can't tell the year ; some time about 1830, 1831, or may be later—the largest amount of money I ever saw in my life, in the possession of one individual. The way I came to see the money was, I went to inquire of him whether a note I had was good. He said, he did not know that he had seen a note like it before. I turned about, and was going out of the store, when he told me to stop, he would see, maybe he had some like it. I heard him go up stairs, and return. He came into the store, with a box the length of two bank-notes and about six inches high. This box was full of bank-notes. He put his hand down on the end, (witness showing how he did it,) and said, there is no note like yours. There was no note less than $10, none higher than $20, that I saw. The box was the breadth of three bank-notes—making six bank-notes to constitute the surface. I thought it the largest amount of money I ever saw in the hands of an individual. I could not estimate its amount ; but this was not all he showed me. I was going again, and he said he would see further. He went up stairs, again, and brought a less box, of about four bank-notes to surface. He put his hand in again, as before. There was nothing more of it, until, some time after, he called on me to endorse a note for a large amount, in Harrisburg Bank. I did not endorse the note, for the amount he wished, but did for about $1500. I think the judgment was paid out of his estate."

*Cross-examined.*—"All his lands were sold by the sheriff, and all his personal property. I know he received considerable sums of money, shortly before his death. He and I were very intimate. To all outward appearance, he was stripped of every thing."

The plaintiff then read, in evidence, the deposition of Jane Bredin, the daughter of James Bredin, the defendant, which was to the following effect :—

"That about the last of January, or first of February, 1832, her uncle, John Bredin, the plaintiff in this case, came to Carlisle ; that her aunt, Mrs. Bredin, was with him, and that this deponent went

with them to Harrisburg and Philadelphia; that, before her uncle, John Bredin, left for Harrisburg and Philadelphia, he loaned to her father $800, and that she has a distinct recollection of her father, James Bredin, of Carlisle, telling her that he got the loan of the money from her uncle; that, on their return from Philadelphia, she recollects of her uncle mentioning, that he had loaned, to her father, $100 more, but she does not recollect distinctly of her father telling her of his having borrowed the $100; that a bond, given by her father, to her uncle, John Bredin, dated the 4th of November, 1833, was witnessed by this deponent; that the bond was in the handwriting of her uncle, John Bredin, and that she was present, and saw her father execute it. She does not recollect the length of time that her father and her uncle were engaged in settling, but knows of calculations being made, and papers there at the time the bond was executed, and that her father and uncle appeared to be both satisfied with the settlement; that the original bond was before her, about a year ago, when she was examined, as a witness in this case, and that the paper now put into her hands, and which she has read, she believes to be a copy, but is not able to state whether it is an exact copy, or not; that she is certain John Gray was not present, when the settlement was made by her uncle and father, and was not there when the bond was written, or when it was executed. At the time the settlement was made, and the bond given, I think my uncle stayed several days. He was very frequently to see us, almost yearly, and generally stayed a week or two; and this deponent knows, that her father always, in his difficulties of almost any description, applied to her uncle for assistance and advice."

The plaintiff requested the court to charge the jury upon three points, of which it is only material to notice the second and third.

Plaintiff's second point.—That there is no evidence before the jury of any fraud or combination on the part of John Bredin, the plaintiff, with design to cheat the creditors of James Bredin, and that their verdict should be for the plaintiff. *On this point*, the court charged, (HEPBURN, President,) that there was no direct evidence of fraud or combination on the part of John Bredin to cheat the creditors of James, but that there were circumstances in evidence which prevented them from instructing the jury, that the plaintiff was entitled to their verdict; and that they therefore referred all the facts and circumstances in evidence to the jury, to draw such inferences and conclusions as they legitimately warranted.

Plaintiff's third point.—That the declarations and acts of James Bredin, in the absence and without the knowledge of John Bredin,

H

whether before or after the execution of the bond, cannot in any way impair or defeat the right of John Bredin to recover in this suit. *To this point*, the court answered thus :—" This is true. The case resting alone upon the acts and declaration of James, could not affect John. The jury have doubtless discovered, that the main inquiry in the cause is the one so fully discussed. Upon the one side, the allegation of fraud, and upon the other, perfect fairness. The disposition of this question devolves upon you."

*On the following point*, submitted by the counsel of the defendants, the court instructed the jury in the affirmative. "If this judgment bond was given by James Bredin to his brother John Bredin, for any amount more than was actually due, and for the purpose of encumbering his real estate in Perry county, and thereby to prevent the creditors of James Bredin from recovering their just debts, it is fraudulent and void ; and that the verdict should be for the defendants." The jury found a verdict for the defendants ; and the plaintiff, having excepted to the charge of the court, removed the record by writ of error to this court, where they assigned for error, the admission of the evidence contained in plaintiff's *first* and *second* bills of exceptions, and the answers of the court to the second and third points submitted by the plaintiff.

*Reed*, for plaintiff in error.—The judgment was regularly entered. The original judgment was opened on the application of John Agnew, and put to issue on the plea of payment. The bond and previous judgments on this issue were conclusive in law, in favour of the plaintiff, whether fraudulent or not, and the court should have so instructed the jury. Brown *v.* Simpson, 2 Watts, 239. John Agnew did not and could not resort to any equity powers for securing his debt, under the circumstances. He had no judgment, no lien in Perry county. Until he had, he could not go into chancery. A creditor must first obtain a judgment at law, before he can proceed in equity against the interest of a debtor in lands ; and to reach personal property, he must have both a judgment and execution. 1 Eq. Dig. title *Debtor and Creditor*, 339 (2) ; 4 Johns. Ch. 671 ; 2 Johns. Ch. 283, 144 ; Eq. Dig. 346 (62) (69) (80) (85) (120), 353 (126), 354 (131) ; 2 Paige, 54.

The bond itself imports a legal obligation ; no fraud is to be presumed. As a general rule, the obligor can do no act, nor make any declaration, in the absence of the obligee, either before, at the time, or after the execution of the bond, to impair its obligation. 5 Bin. 109 ; Philips *v.* Eames, 1 Esp. N. P. R. 357 ; Penn. *v.* Schooly, 5 Esp

N. P. R. 243; Greenleaf's Ev. 120, 22, 123; Wolf v. Carothers, 3 Serg. & Rawle, 240; Chess v. Chess, al., 1 ن. Rep. 32; Hoffman v. Lee, 3 Watts, 352, 5 Serg. & Ra a, 295; Kean v. Ellmaker, 7 Serg. & Rawle, 1; Whiting v. Johnson, 11 Serg. & Rawle, 328. Before any evidence of such acts or declarations of the obligor can be received, proof must be made of some authority in him derived from the obligee, to make them. Such authority may proceed from a combination between the obligor and obligee to commit a fraud, in which case, each is considered as the agent of the other, so far as regards the furnishing of testimony. Declarations received in evidence, where the fraudulent combination was otherwise fully proved, Irwin v. Keen, 3 Whart. Rep. 347. When evidence has been given tending to establish a combination to defraud creditors, the declaration of either party to it, although not made in the presence of the other, may afterwards be given in evidence. McKee v. Gilchrist, 3 Watts, 230.

The establishment of such combination involves in it a question of fact and a question of law. When the facts are proved, the court is to determine, taking them to be true, whether such a combination is established. The proof of combination must amount to what is called *probable cause* in an action of malicious prosecution; or must raise a *probable presumption* of its existence. *Primâ facie* evidence of combination must be first given. It must raise a probable presumption of agency in the obligor, by which he is invested with power to bind the obligee, or affect his rights. This agency must result from *combination or conspiracy*. This combination cannot be proved by the declarations of one of the parties, in the other's absence. Probable cause, a mixed question, 2 Leigh's N. P. 1290, 1294. Probable presumption, 3 Chitty's Black. Com. 371, 372. He also cited Commonwealth v. Eberle et al., 3 Serg. & Rawle, 16; Reitenbaugh v. Reitenbaugh, 1 Rawle, 362, 363; Peake's Ev. 16; 1 Coxe N. J. Rep. 13; 1 Day's Rep. 33; Rogers v. Hall, 4 Watts, 359; Prier v. Junkin, 4 Watts, 85.

*Watts*, for defendant in error.—The innovation upon the practice of the common law, which makes the records of a court the instrument of securing the payment of money, without the direct intervention of the court itself, requires to be strictly guarded, or it will be made the means of perpetrating fraud. Hence the confession of an amicable judgment may not only affect the legitimate object of the parties to it, but may injuriously affect all the creditors of the defendant, unless the court will take cognisance of the sub-

ject, and extend to the investigation of it rules of evidence with a latitude fitted to the nature of the transaction.   The arrangement, then, between the parties to this judgment, is necessarily their own; they call no witnesses to the fraud which they are about to perpetrate, unless it be, to communicate just enough to give an appearance of honesty to the transaction ; and if the party plaintiff may rely safely upon the evidence of the executed fraud, and fold his arms in security with it, there are no means of curing the evil.   In the investigation of the truth then, the court must inquire into such circumstances as can be laid hold of ; such as, the relative pecuniary condition of the parties ; the consideration of the judgment ; the acts and declarations of the parties, or either of them.   And an inquiry into the consideration consists of evidence of what is not proved, as well as what is proved.   It is the duty of the court to require of the plaintiff to show the consideration ; and if he does not show it, it will be a presumption of fraud.   Myers *v.* Hart, 10 Watts, 107. In all questions of fraud, great latitude of evidence must be allowed. 6 Watts, 93, 247 ; 10 Watts, 104.

When an act is done, to which it is necessary to ascribe a motive, what was said at the time, from whence the motive may be collected, is part of the fact—the *res gestæ.*   6 East, 195 ; 5 Term Rep. 512 ; 14 Mass. Rep. 249; 2 Rawle, 227.   The least collusion, either before or after the bond was given between the paties, will justify the receipt of evidence of the declarations of either party, in the absence of the other.   7 Watts, 307 ; 12 Wend. 41; 4 Pick. 378. Then, here, all the facts were submitted rightly by the court to the jury, who came to the conclusion that the payment was given for the purpose of defrauding the creditors.

*June* 8.   GIBSON, C. J.—Much consideration of the peculiar features of this case, has led me to change the opinion of it I originally formed.   It is undoubted that a security cannot be affected by the declarations of him who gave it, unless they be accompanied with proof of such confederacy with him who received it, as would, in other cases, make the act of the one the act of the other ; and the difficulty with me was, to find in the evidence any positive proof of accession by John Bredin, to the plot sworn to by Gray.   He had said nothing, and he seemed to stand clear of it, so far as his acts were disclosed.   But this is not the case of declarations made after the execution of the security ; and it appears to me, at present, that the intrinsic evidence of the whole transaction might be left to the jury to connect him with the original scheme.   That there was

a conspiracy between James Bredin and Gray to defraud the creditors of James, if Gray is to be believed, cannot be doubted; and may not John be shown to have subsequently engaged in it by less than proof of express declarations, or flagrant acts of participation? In the execution of the plot, he was to be a principal actor, and he performed the part assigned to him in it. It is within the range of poss ility, that this may have n the fect of chance; but it is barely so. James was to execute a bond and warrant to him, according to a precedent furnished by Gray, to whom it was returned when it had done its office; and, in due season, John arrives at his brother's, makes a formal settlement with him, and receives a bond, which is entered up just in the nick of time to take precedence of the creditors, who were preparing to pounce upon the property. Every thing happens according to Gray's plan, and just as James would have it. Thus, it is seen, that the character assigned to John was the very one in which he appeared, and that he went through the part at the very time necessary to give the piece success. Now, though these coincidents may possibly have been accidental, they are too wonderful to excite no more than suspicion. Combined with the consanguinity of the parties, and the desperate circumstances of James, they were certainly proper to be left to the jury, as circumstantial evidence of collusion. The exact fulfilment of a prediction that an uncommon event would happen at a particular time, and in a particular way, by the agency of a particular man, would be presumptive evidence of preconcert. So the doing of a foretold thing, apparently innocent, but actually promotive of the object of a conspiracy, would implicate the actor, on the principle that would implicate a man in the taking of a watch from a room to which he alone had access—a case put in Starkie's Law of Evidence, (part 3, p. 483,) as an instance of circumstantial evidence complete in itself. The testimony of Gray, therefore, in connection with the acts of John, was sufficient to shift the burden of proof to the latter, whose exculpatory evidence almost entirely failed. His witness, a niece of himself and a daughter of the obligor, proved the execution of the bond after a settlement, at which papers were produced, and calculations were made. Why were not these, or some of them, produced at the trial? She further testified, that her father said he had borrowed $800 from her uncle, and that the latter afterwards said he had lent the father an additional hundred; but for the residue of the consideration, amounting to $5000, there was no attempt to account. Now, I by no means say, that the evidence was en-

tirely demonstrative of fraud ; but it was certainly proper to be left
to the jury.    The testimony of Line, too, was competent to prove
the circumstances of James ; and the rest of the case was properly
disposed of.

Judgment affirmed.